## MARSHALL v. SAN JACINTO BLDG., Inc.
### No. 2483.

Court of Civil Appeals of Texas. Beaumont.
Dec. 20, 1933.

Rehearing Denied Jan. 17, 1934.

Benckenstein & Carrington, of Beaumont, for appellant.

Orgain, Carroll & Bell, of Beaumont, for appellee.

WALKER, Chief Justice.

On January 7, 1933, appellant, Crawford Marshall, filed this suit in district court of Jefferson county, against appellee, San Jacinto Building, Incorporated, for personal injuries received by him while entering at the Orleans street entrance appellant's fifteen-story office building at the corner of Orleans and Fannin streets in the city of Beaumont. We do not summarize appellant's pleadings, since they were sufficient to invoke in his behalf every proposition of law arising upon the facts of the case, construed most favorably in aid of his alleged cause of action. The answer of appellee was by general demurrer, special demurrer, general denial, and plea of contributory negligence against appellant. The trial was to a jury with judgment in favor of appellee upon an instructed verdict.

The facts are as follows: At the time of the construction of appellee's office building in 1923, the Orleans street entrance was equipped with a revolving door, occupying a space of about five feet. To the right of the revolving door was a single door about two and a half feet wide, with the same sort of door to the left. The entire entrance was about eleven feet wide. The revolving door was operated from October 1st to about March 1st of each year. During the other months of the year the arms, or wings, of the door were folded back to the right and left, leaving the entrance of about four and a half feet in width unobstructed. The two small doors were seldom used, and it was the rule of the building that they should be locked when not in use. The revolving door did not occupy all of the entrance space set apart for its use by two or three inches on each side of the door as it revolved, but the wings of the door were made to "fit" by a felt attachment, thereby excluding the cold, rain, wind, etc. On the Orleans street side the sidewalk was laid immediately against the wall of the building. The entrance to the building was not flush with the street, but was set back a sufficient distance to operate the revolving door without having it swing over the sidewalk; in revolving, the wings of the door came within three and a half or four inches of the edge of the sidewalk. At the time the building was erected, a granite slab, about thirteen inches wide, was built into the entrance, over which it was necessary to walk in entering the building, and over which the revolving door was operated. The sidewalk was built up to and against this granite slab. The granite slab was flush with the floor of the building on the inside of the entrance. On the left side of the entrance this slab was flush with the sidewalk, but for the entire width of the entrance it was laid level and flush with the floor of the building, while the sidewalk was made to conform to the grade of the street, which sloped towards Fannin street. The result was that immediately opposite the left side of the swinging door entrance this granite slab had an elevation of one-eighth of an inch above the sidewalk; immediately opposite the middle of this entrance the elevation was one-fourth of an inch; immediately opposite the right side of the entrance the elevation was one-half an inch; immediately opposite the extreme right side of the eleven-foot entrance the elevation was seven-eighths of an inch. The revolving door was standard equipment for use in office buildings, skillfully installed, maintained, and operated. The entrance was maintained, as described above, from the construction of the building in 1923 continuously without change up to the time this case was tried in the lower court on the 2d of February, 1933, and there is no suggestion in the record that any change has been made in this condition since that date. The building was used constantly by all classes and ages of people, and a check taken from time to time from the erection of the building up to the time this case was tried showed that as many as 8,000 people a day used the building. Including appellant, there was testimony of only three com-

plaints of injuries received from the operation of the revolving door and only two of these were called to the attention of appellee. We quote as follows from the testimony of three of appellant's witnesses and Mr. Pugh, a witness for appellee, describing the appearance of the entrance to one entering the building from Orleans street, in relation to the granite slab above described and referred to.

Harry Courts, one of the persons who reported an injury, testified:

"Q. A man, if he looks, can see that it is there, can't he? A. I suppose he could, yes, sir."

Harry Bonin, the second person claiming an injury, testified:

"Q. All you had to do was to look and see it? A. I guess it was.

"Q. It was easy to see it there if you would look and see it, wasn't it? A. Yes, sir."

Kyle Wheelus, appellee's vice president, testified:

"Q. There is nothing there to keep anybody from seeing what the condition is in front of the door if they looked to see it is there? A. No, I know of no obstruction to keep them from seeing the door.

"Q. I will ask you whether or not it is open and obvious to the eye to see what was there if a man uses his eye? A. No, sir. Yes, sir."

Mr. J. M. Pugh, the manager of the building continuously since its construction, testified:

"Q. Is it a thing that can be seen, or is it a thing that cannot be seen? A. It is very plain and obvious."

There was nothing in the evidence contradicting or modifying in the least the testimony of the four witnesses to the effect that the slight elevation of the entrance slab above the sidewalk was plain, open, and obvious to all persons using the entrance, provided they looked for it. However, there was testimony to the effect that some persons entered the building without noticing this elevation, and this was the testimony of Courts and Bonin. They testified they had not noticed the elevation prior to their injury, though they had used the building many times. Appellant has made certain photographs exhibits to the statement of facts. We have examined these photographs carefully, and they seem to us to make absolutely certain the conclusion that the elevation of the slab was open and obvious to everyone using the building.

Appellant had lived in Beaumont since 1913 and had been in and out of appellee's building many times prior to the date of his injury. He made frequent use of it in 1928 in visiting his attorney, who represented him at that time in an industrial accident claim, but prior to his injury had not noticed the slight elevation of the entrance slab of granite. His injuries were received in the following manner, as testified to by him: He was entering the building to see one of appellee's tenants upon a legitimate business errand.

"Q. You stood here and talked to Mr. Fork a few minutes you say? (In front of the building.) A. Yes sir.

"Q. And when you left did you leave him there? A. Yes sir.

"Q. And you left him there? A. Yes, sir.

"Q. Then you walked right into the building from there? A. Yes sir.

"Q. Is that correct? A. Yes sir.

"Q. Now what happened to you then when you went into the building? A. Well, as I went to go in, as I recall to the best of my recollection, I caught the panel of the door to go in and somebody was coming out of the door, and as I went in I stumbled and I throwed my hand to catch myself, and when I did it went in between the panels and the—

"Q. Well did you catch—have your hand mashed behind that panel? A. Yes sir.

"Q. While it was rotating? A. Yes sir.

"Q. Was the door moving when you went into it? A. Yes sir.

"Q. No one was coming out as you moved in? A. Yes sir.

"Q. What happened when you reached the inside? Did you fall on the floor? A. No sir.

"Q. You did not? A. No sir.

"Q. You stood up all the way through? A. Yes sir.

"Q. What happened when you got inside? A. My hand was released.

"Q. Which hand was that? A. The right hand.

"Q. The right hand? A. Yes sir.

"Q. State what happened immediately after this injury? A. Well, I went up stairs. I went up to the Sun Company's office and I went back down to Kitching and Kenna's office; I had some business to attend to with them; I don't remember what floor either one of them were on.

"Q. Mr. Marshall go into a little more detail how this accident happened. You have examined that door since the accident happened have you not? A. Yes sir.

"Q. And what do you find there? A. Well I find that there is a granite strip that extends up, I don't know about—to go into the door from the right hand side, I imagine it sticks up about ¾ths of an inch; I never did measure it, but by looking at it I would judge it sticks up about that high.

"Q. Go ahead. A. On the side coming out it looks to be, well less than half an inch.

"Q. You say you stumbled on this strip? A. Yes sir.

"Q. That is your recollection? A. Yes sir.

"Q. And do you recall whether you caught the door falling forward, or did you trip on it after you grabbed the panel? A. No, I had my hand on the panel to the best of my recollection, the left hand as it comes around, and I am positive that I tripped with my hand on the panel."

## Opinion.

 The trial court ruled correctly in instructing the verdict against appellant. The slight elevation of the granite slab at the entrance of the building, upon which appellant relied to establish negligence, was not a hidden danger nor a trap, snare, pitfall, or anything of like character. It was open and obvious to all users of the building. It was a permanent condition, built into the building as a part of the original structure, and maintained constantly from that date without change. The revolving door was standard equipment, skillfully installed, operated, and maintained. The rule of law defining appellee's duty, in relation to the alleged dangerous condition, to appellant, an invitee, using the building for legitimate business purposes, is thus stated by 45 C. J. 837: "The duty to keep premises safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and would not be observed by him in the exercise of ordinary care. The invitee assumes all normal or ordinary risks attendant upon the use of the premises, and the owner or occupant is under no duty to reconstruct or alter the premises so as to obviate known and obvious dangers, nor is he liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care." Again, at page 868, same volume: "No precautions are necessary where the danger is obvious and unconcealed, or known to the person injured, or where it was the duty of the person injured to do the thing, failure to do which caused the injury." To the same effect is the rule announced by 20 R. C. L. pp. 56, 57: "The true ground of liability is the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property. It is when the perilous instrumentality is known to the owner or occupant and not known to the person injured that a recovery is permitted. * * * And, hence, there is no liability for injuries from dangers that are obvious, or as well known to the person injured as to the owner or occupant." Our Supreme Court announced the same general rule in Stimpson v. Pipe Line Co., 120 Tex. 232, 36 S.W.(2d) 473, 476: "If it appears that the injury complained of was produced by a peril of an obvious or patent character a recovery should be denied." See, also, the Court of Civil Appeals opinion, Wilson v. Werry, 137 S. W. 390 (writ refused).

The following cases from other jurisdictions support the conclusion of the trial court that the slight elevation of the entrance slab of granite did not raise an inference of negligence against appellee: Ware v. Baptist, etc., Missionary Society, 181 Mass. 285, 63 N. E. 885, by the Supreme Court of Massachusetts, was an action of tort to recover for personal injuries sustained by the plaintiff through the alleged negligence of the defendant. The court said: "The injury complained of was due to a fall received by the plaintiff while passing from one of the rooms in the Tremont Temple Building, so called, in Boston, belonging to the defendant, to the hallway or corridor on which the room opened. The floor of the room was 4⅞ inches above the floor of the hallway, and it was this difference in height which caused the plaintiff, as she stepped forward out of the room, to fall. She had entered the room a few minutes before through the same door. She had never been in the building previously, if that is material. It is contended that this construction was defective, and this is the negligence alleged. It is matter of common observation that in entering and leaving stores, halls, railway car stations and platforms, office buildings, and other buildings and places, and private houses, adjoining surfaces are frequently at different levels; and the difference in level has to be overcome by one or more steps, of greater or less height, or by some other device."

Hoyt v. Woodbury, 200 Mass. 343, 86 N. E. 772, 773, 22 L. R. A. (N. S.) 730, also by the Supreme Court of Massachusetts, was an action of tort to recover for injuries sustained by the plaintiff from a fall on premises of the defendant under these circumstances, quoting from the court's opinion:

"The passageway to the entrance to the upper stories was raised above the sidewalk and tiling leading to Bauer's store from 2½ to 3¼ inches, and the line of separation between these two levels of tiling continued the diagonal line made by Bauer's show window to the sidewalk line. The plaintiff stumbled over this riser between the two levels of tiling as she was coming out of the store on a sunny afternoon.

" * * * He (the defendant) owned a lot of land on a slight hillside, and it abutted upon a street which descended the hill. He had a right to improve his real estate in any reasonable way. He chose to maintain upon it a block with two stores separated by an entrance to upper stories. The problem which confronted him in doing this was so to arrange the means of access to these three entrances as to adapt them to the varying grade of the adjacent sidewalk. This could have

been done in any one of several different ways. But it obviously must have been done in some way. So long as the present physical configuration of this commonwealth continues to exist, substantially the same difficulties will confront those who undertake to erect structures for use of the public. Methods may change, and facilities of access may grow better, but the situation of buildings abutting upon hilly streets will abide. Persons entering this building were charged with knowledge that they were not entering from a perfectly level sidewalk, and that generally the floors of buildings are not of precisely the same elevation as the sidewalk, even where it is level. Customers entering or leaving stores cannot be oblivious of these almost universally prevailing conditions. Owners of buildings have a right to proceed in their constructions in view of this common observation on the part of the public and assume in the actions of those, who may frequent their buildings, the exercise of ordinary circumspection as to their footing."

In conclusion, in that case, the court said that in arranging the approach to the upper floors of the building "the defendant violated no duty which he owed to the plaintiff," citing in support of this holding the Ware Case, supra, and Lorenzo v. Wirth, 170 Mass. 596, 49 N. E. 1010, 40 L. R. A. 347. Negligence in the construction of the entrance to a public building was before the court in Watkins v. Piggly Wiggly Bird Co. (C. C. A.) 31 F.(2d) 889, 891. In holding in that case that the plaintiff had no cause of action, it was said: "Certainly it is not unusual to find the sidewalk and the street entrance of stores, particularly in small places, on different levels, and, it may be added, without an outside step or platform in front of the entrance."

In an able brief appellant has cited and reviewed many authorities in support of his theory of liability. However, a careful review of these authorities bring them within the following analysis made by the court of the authorities cited by the plaintiff in Watkins v. Piggly Wiggly, etc., supra: "All the cases cited by plaintiff have been carefully examined, and none found which permitted recovery for the maintenance of an entrance to a store such as is here complained of. In the cases cited by plaintiff, wherein the construction was at all similar to that maintained by the defendant in this case, recoveries were permitted because the light was insufficient, or the opening into which, or the step from or over which, the plaintiff fell, was concealed in some way, or the attention of the person injured directed to merchandise on display, or a door opening into a basement, an elevator shaft, or other dangerous place by its location near another door, which the public was invited or the person complaining had the right to enter, became a trap for the ignorant."

Some of the cases cited by appellant do not bear directly upon the issue in this case but illustrate the duty owed by the landlord generally to an invitee while on his premises.

After briefing his case thoroughly, in conclusion appellant has thus summarized his controlling proposition: "The real fact issue involved herein is as to whether or not a partially raised sill before a revolving door * * * raised an issue of fact as to negligence. * * * It might be argued that because there is only a slight rise of approximately an inch the danger was negligible and unworthy of consideration. This fact is the very essence of whatever dangerous element was inherent in the condition. Had there been a full size step which would attract an ordinarily careful and prudent person's attention, there would have been little reason to complain that one side was an inch higher than the other." The point is also made that the similarity in the color of the granite and the cement sidewalk added to the confusion of the users of the entrance and was, therefore, a potent fact on the issue of negligence. As stated above, we think a complete answer to these contentions is found in appellant's own testimony: First, as reflected by his photographs of the entrance, revealing clearly the slight elevation of the granite slab; second, by the testimony of his witnesses to the effect that the elevation was open and obvious, quoting again the testimony of Mr. Wheelus, "It is open and obvious to the eye to see what is there if a man uses his eyes"; and, third, by the fact that more than 10,000,000 people, under the count kept by appellee, have used this building since its construction, with the record of only three injuries resulting from the use of the revolving doors.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

Affirmed.